UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Lynette V.

    Plaintiff,

    v.

Commissioner of Social Security,

    Defendant.

Civil Action No. 2:22–cv–110–kjd

## OPINION AND ORDER
(Docs. 10, 12)

Plaintiff Lynette V. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) and an award of benefits or, alternatively, remand for further proceedings. Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 12). For the reasons stated below, Plaintiff's motion is GRANTED in part, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

## Background

Plaintiff was forty-five years old on her alleged disability onset date of February 22, 2016. (AR 128.) She completed two years of college and has work experience in medical billing and as a surgical coordinator. (AR 97, 102.) She lived in Florida when she filed her disability claim (AR 128, 207), but now lives in Sheldon, Vermont with her son, daughter-in-law, and two grandchildren (AR 69, 1100).

Plaintiff suffers from lupus, disorder of connective tissue, thrombocytopenic disorder, and arthritis.  (AR 364.)  She stopped working in February 2016 due to chronic exhaustion, dizziness, and muscle weakness.  (AR 603.)  She experiences pain in her elbows, fingers, knuckles, wrists, and feet.  (AR 1096.)  Plaintiff testified that she "always feel[s] tired" and is "always in pain." (AR 71.)  Her "hands are always swollen" and are "tingling" and "have no feeling."  (*Id.*)  She is unable to bend her knees due to pain and swelling.  (AR 73.)  Plaintiff can only hold her cup of coffee in the morning if she uses both hands and is unable to pick up or open the container of milk because her hands are so weak.  (AR 71.)  Her daily activities include watching television for one or two hours, speaking with her mother on speakerphone, and helping her mother with tasks online, such as paying her bills.  (AR 72–73.)  She usually lies down to rest between 1:00 p.m. and 3:00 p.m. because she feels so fatigued.  (AR 77.)  She testified that when she was working, "at about that time of day, [she] had to leave because [she] wouldn't be able to function" and she "couldn't focus" because "[a]ll [she] wanted to do was just [lie] down."  (*Id.*)  She estimated that she could stand for about an hour, but then would have to rest for half an hour before she could stand again.  (AR 77–78.)  She also noted that she could not work as a surgical coordinator because the role was too stressful, which intensified her pain and fatigue.  (AR 1098–99.)  She stated that she could not work as a billing clerk because she is unable to use the computer or type for too long because of the pain and stiffness in her hands.  (AR 1099.)

Plaintiff filed her application for DIB on February 7, 2017, alleging a disability onset date of February 22, 2016.  (AR 364, 373.)  Her application was denied initially on April 20, 2017 (AR 140), and upon reconsideration on June 28, 2017 (AR 147).  Plaintiff timely filed a request for an administrative hearing.  (AR 154.)  Administrative Law Judge (ALJ) Thomas Merrill conducted a hearing on September 25, 2019.  (AR 64–84.)  Plaintiff testified at the hearing and was

represented by counsel.  (*Id.*)  A vocational expert also testified at the hearing.  On November 27, 2019, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from her alleged disability onset date through the date of the decision.  (AR 21–33.)  The Appeals Council denied Plaintiff's request for review.  (AR 1–3.)  Plaintiff filed a complaint in this Court, *Velazquez v. Kijakazi*, Civil Action No. 2:20-cv-160.  The Court granted the Commissioner's Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. § 405(g) with Reversal and Remand of the Cause to the Commissioner, with instructions that the ALJ re-evaluate the opinion evidence under 20 C.F.R. § 404.1527 and, if warranted, further evaluate Plaintiff's residual functional capacity and determine whether she can perform any other work. The ALJ conducted a second evidentiary hearing on December 13, 2021.  (AR 1090–1108.) Plaintiff again testified at the hearing and was represented by counsel.  (*Id.*)  A vocational expert also testified at the hearing.

ALJ Merrill issued a second unfavorable decision on January 27, 2022.  (AR 1065–83.) Plaintiff did not file written exceptions to the Appeals Council, and the Appeals Council did not take up the ALJ's decision on its own.  Having exhausted her administrative remedies, Plaintiff timely filed a complaint on May 25, 2022 seeking review of the decision in this Court.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to

determine whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is

presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v.*

*Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

      If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity (RFC), which means the most the claimant can still do

despite his or her mental and physical limitations based on all the relevant medical and other

evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The

fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of

his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the

ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g),

416.920(g).  The claimant bears the burden of proving his or her case at steps one through four.

*Butts*, 388 F.3d at 383.  At step five, there is a "limited burden shift to the Commissioner" to

"show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*,

566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five

is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

      The ALJ first determined that Plaintiff had not engaged in substantial gainful activity

during the period from her alleged onset date of February 22, 2016, through her date last insured

of December 31, 2021.  (AR 1068.)  At step two, the ALJ found that Plaintiff had the severe

impairments of lupus and thrombocytopenic disorder.  (*Id.*)  The ALJ noted that the record

contained other related diagnoses and corresponding symptoms, which he also considered.  (AR

1068–69.)  The ALJ also considered Plaintiff's claim of disability due to chronic exhaustion,

dizziness, and muscle weakness, concluding that these were "symptoms, not distinct diagnoses,"

but that he had also considered the symptoms under the diagnosis of lupus.  (AR 1069.)  The ALJ also concluded that Plaintiff's arthritis, lumbar facet arthropathy, gastroesophageal reflux disease, and carpal tunnel syndrome did not more than minimally limit her ability to perform basic work activities and thus were non-severe or not medically determinable.  (AR 1069–70.)  At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 1071.)  The ALJ next determined that Plaintiff had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b).  (AR 1072.)  Given this RFC, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a Medical Billing Clerk or a Patient Insurance Clerk through the date last insured.  (AR 1082.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability from her alleged disability onset date of February 22, 2016, through December 31, 2021, the date last insured.  (AR 1083.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that her "impairments are of such severity that [s]he is not only unable to do h[er] previous work[,] but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting

the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" in the record supports the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In conducting its review, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied."  *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff contends that substantial evidence does not support the ALJ's assessment of the weight given to the opinions of treating physicians Hector Delgado, DO and Bonita Libman, MD, and consulting physician Richard Lewis, MD.  (Doc. 10 at 3–4.)  Plaintiff further argues that the ALJ did not conduct a complete credibility analysis when he assessed Plaintiff's statements about her symptoms and pain.  (*Id.* at 7.)  According to Plaintiff, consideration of the treating physician opinions under the proper legal standard requires the conclusion that she is disabled.  Therefore, Plaintiff requests that her case be remanded for calculation of benefits.  (*Id.*)  In the alternative, Plaintiff requests that the Court remand her case for further administrative proceedings.  (*Id.* at 10.)

The Commissioner requests that the decision be affirmed because the ALJ correctly evaluated the medical opinions and substantial evidence supports the ALJ's findings regarding Plaintiff's subjective statements about her symptoms.  (Doc. 12 at 3, 10.)  Should the Court determine that substantial evidence does not support the ALJ's decision, the Commissioner requests remand for further proceedings, not calculation of benefits.  (*Id.* at 12.)

## I.     ALJ's Analysis of the Medical Opinions

For disability claims filed before March 27, 2017, including Plaintiff's claim in this case, the applicable regulations generally give deference to the opinions of treating physicians over the opinions of non-treating sources.  *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The [Social Security Administration] recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant.").  Under this "treating physician rule," a treating source's opinion regarding the nature and severity of the claimant's impairments receives "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The regulations explain the reason for this approach to treating source opinions:

> [W]e give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*

If the ALJ determines that a treating source's opinions should not receive controlling weight, the ALJ must determine how much weight, if any, to give those opinions.  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  In considering the appropriate weight to give a treating

source opinion, the ALJ "must 'explicitly consider' the following, nonexclusive '*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion[s]; (3) the consistency of the opinion[s] with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Id.* at 95–96 (first alteration in original) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *see* 20 C.F.R. §§ 404.1527(c), 416.927(c). "After considering these factors, the ALJ must provide a meaningful explanation for assigning a particular weight to a treating physician's opinion. 'Failure to provide such good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Byrne v. Berryhill*, 752 F. App'x 96, 98 (2d Cir. 2019) (quoting *Burgess*, 537 F.3d at 129–30). Remand is necessary where "[t]he court cannot be confident that [the claimant] 'received the [treating physician] rule's procedural advantages,' nor can it conclude that 'the substance of the treating physician rule was not traversed.'" *Alexander v. Comm'r of Soc. Sec.*, No. 5:14-cv-00039, 2014 WL 7392112, at *6 (D. Vt. Dec. 29, 2014) (third alteration in original) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

Dr. Delgado, Dr. Libman, and Dr. Lewis provided the relevant opinion evidence in this case. (AR 1081–82.) Dr. Delgado was Plaintiff's primary care doctor in Florida between 2009 and 2017. (AR 520, 890.) The ALJ determined that Dr. Delgado's opinion was entitled to "no weight." (AR 1081.) Dr. Libman specializes in rheumatology and began treating Plaintiff regularly after she moved to Vermont in 2018. (AR 912.) The ALJ determined that Dr. Libman's opinion was entitled to "little weight." (AR 1081.) Dr. Lewis is a state agency medical consultant who rendered an opinion on June 26, 2017 after reviewing Dr. Delgado's records. (AR 124–25.) The ALJ determined that Dr. Lewis's opinion was entitled to "substantial weight." (AR 1082.)

For the reasons explained below, the ALJ erred in his assessment of the weight given to these opinions.

### A.  Dr. Delgado's Medical Opinions

Dr. Delgado was Plaintiff's primary care physician from 2009 through 2017.  The ALJ considered Plaintiff's treatment with Dr. Delgado—even though much of it occurred before Plaintiff's February 22, 2016 disability onset date—to place Plaintiff's symptoms and limitations into context and to determine the consistency of Plaintiff's subjective statements with the objective record evidence.  (AR 1065–66.)

On February 5, 2016, Dr. Delgado wrote a letter to Plaintiff's employer requesting that Plaintiff be granted a four-week temporary leave of absence from work beginning February 22, 2016.  (AR 603.)  Dr. Delgado noted that Plaintiff had Disorder of Connective Tissue, Thrombocytopenic Disorder, and Arteritis, and was "suffering from chronic exhaustion, dizziness and muscle weakness."  (*Id.*)  He wrote that the leave of absence was "of absolute medical necessity for [Plaintiff's] long term wellbeing."  (*Id.*)  On March 15, 2016, Dr. Delgado stated in a Short Term Disability Claim Form that Plaintiff's primary diagnoses were depressive disorder, disorder of connective tissue, and thrombocytopenic disorder.  (AR 528.)  Dr. Delgado wrote that Plaintiff was currently restricted to "no work" due to her severe pain myalgias, knee pain, and depressed mood.  (AR 529.)

After a March 23, 2016 follow-up appointment, Dr. Delgado completed a medical source form in which he asserted that Plaintiff would be unable to perform work functions for more than one hour, and would be unable to lift, push, or pull more than five pounds.  (AR 521.)  In Dr. Delgado's opinion, Plaintiff's condition would cause a full/continuous period of inability to perform her job functions and estimated that she would have episodic flare-ups two times per

month, each lasting for between twelve hours and three days.  (*Id.*)  Dr. Delgado also wrote a letter

extending until May 23, 2016 his modified bed rest order and request for a temporary leave of

absence from work.  (AR 859.)

The ALJ stated that on that date—May 23, 2016—"Dr. Delgado did a 'basic cardio PE,'

noting that the claimant had no edema and 2+ pulses of her extremities."  (AR 1080.)  The ALJ

also noted that Plaintiff "reported no chest pain, no arm pain on exertion, no shortness of breath

with walking, no shortness of breath when lying down, no palpitations and no known heart

murmur," and that "[h]er thyroid, lungs[,] and heart were normal."  (AR 1080–81 (internal

citations omitted).)  The ALJ relied on these findings to conclude that "Dr. Delgado's assessments

are not consistent with or supported by the objective medical evidence of record" and therefore

assigned Dr. Delgado's opinions no weight.  (*See* AR 1081.)  However, the ALJ did not note that

also on May 23, 2016, Plaintiff reported abdominal pain, muscle aches, muscle weakness, and

arthralgias/joint pain, which is consistent with Plaintiff's report of symptoms throughout the

record.  (AR 432.)

On April 4, 2016, Dr. Delgado wrote another letter to Plaintiff's employer regarding his

patient's need for a continued leave of absence.  (AR 599.)  Dr. Delgado advised that at her

January 18, 2016 appointment, Plaintiff reported muscle aches and arthralgias/joint pain, fatigue,

depression, sleep disturbances, and right knee pain.  (*Id.*)  Dr. Delgado further noted that, during

her visit on March 23, 2016, Plaintiff presented with symptoms that included abdominal pain, IBS,

muscle aches, muscle weakness, depression, and arthralgia/joint pain.  (*Id.*)  Dr. Delgado also

stated that Plaintiff had seen rheumatologist Dr. Olga Kromo on February 1, 2016 and March 29,

2016, and that Dr. Kromo had prescribed Plaintiff methylprednisolone to help alleviate her

symptoms.  (*Id.*)  Dr. Delgado advised that Plaintiff "will return to work when she has been

medically cleared by all specialists involved in her care."  (*Id.*)

Regarding Plaintiff's May 23, 2016 appointment with Dr. Delgado, the ALJ observed that

"Dr. Delgado again noted that the claimant reported no chest pain, no arm pain on exertion, no

shortness of breath with walking, no shortness of breath when lying down, no palpitations[,] and

no known heart murmur."  (AR 1081.)  However, Plaintiff's report of symptoms on that date

included shortness of breath, arthralgias/joint pain, neck pain, joint pain in her right knee and

elbows, achiness, fatigue, and dizziness to the point that she felt she could not drive.  (AR 751.)

As Plaintiff has not alleged any claims regarding chest pain, palpitations, or heart murmurs, it is

unsurprising that Dr. Delgado did not record such symptoms.  Although the ALJ notes

Dr. Delgado's observation of Plaintiff's "normal gait" (AR 1081), Dr. Delgado's full notation

states that Plaintiff was ambulating normally, but in "severe distress."  (AR 751).  The ALJ wrote

that Plaintiff's "extremities had no cyanosis, no edema, no varicosities, and no palpable cord" (AR

1081), but he did not note Dr. Delgado's observation that the skin on her hands and feet was

"mottled." (AR 752.)

Regarding Plaintiff's August 8, 2016 appointment with Dr. Delgado, the ALJ stated that

Dr. Delgado "noted that [Plaintiff] had no tenderness and normal movement of all extremities,

with no bony abnormality."  (AR 1081 (citing AR 747).)  However, Plaintiff also reported having

"sever[e] pain all over" at that appointment.  (AR 746.)  Moreover, Plaintiff reported that she felt

chills and heat two to three times per day, and was experiencing "muscle aches, muscle weakness,

and swelling in the extremities (behind the knee has swelling with difficulty bending knee)."  (*Id.*)

Upon examination, Dr. Delgado noted swelling and "multiple tender points" on her shoulder,

thoracic area, and bilateral knees, arms, and hands.  (AR 747.)  Dr. Delgado also wrote that

Plaintiff was experiencing mild distress and limited ambulation.  (*Id.*)

On September 22, 2016, Plaintiff reported pain and myalgias in both knees, constant

fatigue, swollen hands with stiffness worse in the morning, and that she felt dizzy to the point that

she was "with [her] mother at BJ's and almost fell," had to go home, and was in bed with

symptoms for three days.  (AR 742.)  Dr. Delgado also wrote that Plaintiff had severe pain, was

unable to work a forty-hour week due to her severe symptom flare-up, and that he intended to

obtain rheumatology and hematology notes from her other providers "for persistent

thrombocytopenia."  (AR 743.)  Despite these findings, regarding this visit the ALJ wrote only

that Dr. Delgado noted non-pitting edema in Plaintiff's legs and mild swelling in Plaintiff's hands.

(AR 1081.)  During Plaintiff's last visit with Dr. Delgado on January 24, 2017, she presented with

fatigue, body aches, and mottled skin on her hands.  (AR 727, 731.)  Yet the ALJ wrote only that

Dr. Delgado "noted that the claimant had no edema of her extremities," and her "thyroid, lungs

and heart were normal."  (AR 1081.)

The ALJ determined that Dr. Delgado's assessments were "not consistent with or

supported by the objective medical evidence of record" and thus were "entitled to no weight."

(*Id.*)  Specifically, the ALJ found that "[t]here are no objective clinical findings to limit sitting to

an hour and lifting to five pounds."  (*Id.*)  Applying the treating physician rule to the ALJ's

analysis of Dr. Delgado's opinions, the Court finds that the ALJ made several errors.

First, the ALJ stated that, "[d]espite [Plaintiff's] complaints of widespread pain, fatigue,

stiffness, and breathing problems, objective findings throughout the relevant period showed

minimal abnormalities."  (AR 1079.)  But Dr. Delgado's opinions and treatment notes showing

more than "minimal abnormalities" are "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Throughout the course of Plaintiff's treatment with Dr. Delgado, Plaintiff consistently reported symptoms including muscle aches (AR 432, 727, 746, 751, 877), muscle weakness (AR 432, 742, 746, 877), joint pain (AR 432, 742, 746, 751, 877), and fatigue and dizziness (AR 727, 742, 751, 877).

Second, the ALJ did not discuss the *Burgess* factors in determining the weight to give Dr. Delgado's opinion.  *Estrella*, 925 F.3d at 95–96.  Specifically, the ALJ did not address the frequency, length, nature, and extent of Dr. Delgado's treating relationship with Plaintiff.  *See* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.").  Plaintiff received treatment from Dr. Delgado from 2009 to 2017 and had at least eight appointments with Dr. Delgado within the twelve-month period immediately preceding her alleged disability onset date through the date she moved to Vermont.  (*See* AR 430, 528, 599, 603, 742, 746, 749, 769.)

The ALJ did not explicitly consider the "amount of medical evidence supporting [Dr. Delgado's] opinion[s]" or "the consistency of [Dr. Delgado's] opinion[s] with the remaining medical evidence."  *See Estrella*, 925 F.3d at 95–96.  Rather, the ALJ improperly cherry-picked those sections of the record supporting his conclusion, while not accounting for record evidence supporting a finding of disability.  *See Smith*, 687 F. Supp. at 904.

Finally, the ALJ failed to consider that, while Dr. Delgado was Plaintiff's primary care physician and not a specialist, his records are entirely consistent with those of treating rheumatologist, Dr. Kromo.  *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).  Plaintiff received

concurrent treatment from Dr. Kromo during the relevant period.  (*See* AR 437, 850, 876.)

Although the ALJ referred to Dr. Kromo's notes in his analysis of Dr. Delgado's opinions, he did

not specifically weigh Dr. Kromo's opinions, or consider Dr. Kromo's records in determining the

weight to give Plaintiff's other medical providers' opinions, including those of Dr. Delgado.  (*See*

AR 1080.)  But Dr. Kromo's records are consistent with Dr. Delgado's opinions.  For example, on

February 1, 2016, Plaintiff reported to Dr. Kromo that she experienced low-grade fever, fatigue,

night-time sweating, tingling and numbness, and pain and clicking on the range of motion of her

right knee.  (AR 435–36.)  Dr. Kromo wrote that Plaintiff's undifferentiated connective tissue

disease had a "very concerning presentation," and she thus prescribed Plaintiff a low dosage of

Medrol.  (AR 437.)  The ALJ did not address these findings, stating only that Plaintiff "denied

muscle weakness on February 1, 2016."  (AR 1080.)

On March 29, 2016, Dr. Kromo wrote that Plaintiff presented with pain in her hands with

stiffness, worsened right knee pain, pronounced oral and ocular sicca, and some recent hair

thinning, which are all symptoms of lupus.  (AR 850.)  Dr. Kromo noted Plaintiff had had an

unclear response to the low dose Medrol but also improved joint complaints and stiffness.  (*Id.*)

Dr. Kromo suggested Plaintiff wean off Medrol because the benefit of its use was unclear.  (AR

852.)  Dr. Kromo recorded tenderness upon squeezing Plaintiff's metacarpal and metatarsal joints,

tenderness in her right knee, and stiffness in her spine.  (AR 851.)  Plaintiff's skin examination

revealed lesions, malar erythema, livedo reticularis, and Raynaud's phenomenon, consistent with

lupus.  (*Id.*)

On September 14, 2016, Plaintiff reported to Dr. Kromo that she was experiencing

"worsened pain in the hands/knees/ankles and shoulders with stiffness," and that she could not

wean off Medrol due to these and other severe symptoms.  (AR 876.)  Plaintiff reported feeling

fatigued and having fever, blurry vision, dry eyes, mouth dryness, shortness of breath, tingling, numbness, photosensitivity, rash, dry skin, localized skin discoloration, abnormal and antalgic gait and stance, pronounced tenderness upon squeezing the metacarpal and metatarsal joints, tenderness of her right knee, and stiffness of her spine.  (AR 877.)  Regarding Plaintiff's undifferentiated connective tissue disorder, Dr. Kromo recorded that Plaintiff had severe symptoms at this time and was dependent on Medrol; she also noted that Plaintiff's right knee was in pain once again.  (AR 878.)  Dr. Kromo prescribed hydroxychloroquine to treat the pain.  (*Id.*)  At Plaintiff's October 25, 2016 appointment with Dr. Kromo, Plaintiff appeared to be responding well to the hydroxychloroquine and was attempting to reduce Medrol to half a dose over the next four weeks.  (AR 881.)  Plaintiff's knee pain was stable.  (*Id.*)  Dr. Kromo's records are consistent with Dr. Delgado's records.

For these reasons, the ALJ's analysis of Dr. Delgado's opinions was erroneous and requires remand.

## B.    Dr. Libman's Medical Opinions

The ALJ focuses his analysis of Dr. Libman's opinion on a medical source statement she completed on August 13, 2019.  (AR 1081.)  Dr. Libman opined that Plaintiff suffered from systemic lupus erythematosus, and her symptoms included severe joint pain, swelling, and stiffness.  (AR 977.)  Dr. Libman confirmed that joint swelling, tenderness, and Plaintiff's positive DNA and ANA tests were some of the clinical findings, objective signs, or laboratory results that supported her analysis of Plaintiff's medical conditions.  (*Id.*)  Dr. Libman explained that Plaintiff was "on Plaquenil with inadequate response" and that Plaintiff has "needed prednisone—with improvement—but cannot stay on prednisone long term due to risk of side effects."  (*Id.*)

Dr. Libman wrote that Plaintiff could lift less than ten pounds less than occasionally, and could never lift ten, twenty, or fifty pounds.  (*Id.*)  Dr. Libman assessed that Plaintiff could sit for thirty minutes at a time and stand or walk for five minutes at a time.  (AR 978.)  Within an eight-hour day, Dr. Libman estimated that Plaintiff could stand or walk for less than two hours and sit for about three hours.  (*Id.*)  Dr. Libman wrote that Plaintiff's symptoms of severe joint pain and stiffness would likely cause her to be off task twenty percent or more of the day.  (AR 979.)  Finally, Dr. Libman estimated that Plaintiff would miss more than four days of work per month due to her medical conditions or treatment.  (*Id.*)  The ALJ found that the limitations identified by Dr. Libman "are not supported by the mild clinical findings and are entitled to little weight."  (AR 1081.)

After moving to Vermont, Plaintiff began treating with Dr. Libman on March 27, 2018. (AR 1002.)  During her physical examination, Dr. Libman noted Plaintiff's report of "[f]evers, . . . [f]atigue, sweats, weight gain, sicca symptoms in the eyes, mouth sores, palpitations, dyspnea, constipation, itching, alopecia, blue fingers in the cold, photosensitive rash on the cheeks, depression, anxiety, mood change, trouble sleeping, urinary frequency and burning, muscle weakness, occasional headaches," and numbness.  (*Id.*)  Dr. Libman wrote that Plaintiff "appears to have an undifferentiated connective tissue disease, could represent evolving lupus."  (AR 1003.) On that date, Plaintiff's anti-DNA and ANA tests came back positive, which are indications of lupus.  (AR 1035–36.)

Plaintiff had a follow-up appointment six months later on September 27, 2018.  (AR 1004.) Notes of the visit indicated that she again had fever, eye pain or dryness, mouth or nose sores, chest pain, shortness of breath, skin rash, joint pain, numbness/tingling, burning on urination, and hand/foot color change in the cold.  (AR 1011.)  Upon musculoskeletal examination, Morgan

Merchand, APRN, recorded mild diffuse tenderness to the joints of Plaintiff's right hand, but did

not note significant tenderness or impact to range of motion elsewhere.  (AR 1013.)  Nurse

Merchand's notes indicate that Plaintiff's previous diagnosis of undifferentiated connective tissue

disease now presented as full systemic lupus erythematosus with a positive double-strand DNA

test, which is commonly used to diagnose and monitor lupus.  (AR 1014.)  Nurse Merchand also

identified that Plaintiff was experiencing alopecia, myalgias, malar rash, livedo, face rash and

sicca symptoms, and photosensitivity.  (*Id.*)  Nurse Merchand noted that Plaintiff had started

Plaquenil at her last visit, "which has helped some, but continues with myalgias/arthralgias, oral

sores, fatigue requiring the ability to [lie] down in the afternoon/or nap[,] and an inability to work

[due to] flares."  (*Id.*)  Nurse Merchand also prescribed Plaintiff methotrexate to "hopefully

address myalgias/arthralgias and fatigue."  (*Id.*)

Plaintiff had another appointment with Dr. Libman in March 2019.  (AR 1019–29.)  The

treatment note indicates that Plaintiff reported "2 weeks of worsening left gluteal pain with

radiation down the leg" which "interferes with her sleep at night."  (AR 1024.)  Plaintiff

additionally "ha[d] bilateral hip and thigh pain for the past 3 months," though she reported "[n]o

numbness or tingling except occasionally in the knee and sometimes in the hands."  (*Id.*)  Plaintiff

"report[ed] a lot of pain and swelling in her hands especially at night and in the morning" and "is

quite stiff in the morning and has reduced grip strength."  (*Id.*)  Plaintiff's musculoskeletal exam

revealed that she had "[g]ood range of motion [of] both hips with mild right trochanter tenderness"

and "[t]ender[ness] over the left upper gluteal region."  (AR 1026.)  Dr. Libman assessed that

Plaintiff's "connective tissue disease is most likely lupus," and believed "it is flaring and causing

symptoms in her hands although . . . the lower extremity symptoms are a separate issue."  (AR

1027.)  Dr. Libman prescribed "a short course of prednisone to improve her symptoms" and discussed the possibility of prescribing methotrexate.  (*Id.*)

At Plaintiff's August 13, 2019, appointment, Dr. Libman reported that Plaintiff's lupus was "flaring with severe arthritic symptoms," and she "do[es] agree that currently [Plaintiff] would not be able to work" and thus she would be "filling out [Plaintiff's] disability paperwork." (AR 974.)  Though Plaintiff had previously declined to begin methotrexate due to concern about side effects, Dr. Libman noted that Plaintiff was "willing to give methotrexate a try to see if she can improve her symptoms."  (*Id.*)  Dr. Libman prescribed methotrexate but did not want to wean Plaintiff off Plaquenil until they could be sure it was helping.  (*Id.*)  In her musculoskeletal exam, Dr. Libman assessed that Plaintiff had "[m]ild swelling and moderate tenderness" in her wrists and hands.  (*Id.*)  Dr. Libman also found "[t]enderness without swelling" of both ankles and the joints in her feet, as well as her knees.  (*Id.*)  Plaintiff reported eye pain or dryness, mouth or nose sores, joint pain, numbness/tingling, shortness of breath, skin rash, and burning on urination.  (AR 975–76.)  Dr. Libman also recorded that Plaintiff presented with the following lupus symptoms: fatigue, arthralgias, livedo, face rash, sicca, alopecia, photosensitivity, oral ulcers, ANA, and phosphatidylserine IgG.  (AR 971.)  Dr. Libman described Plaintiff's report of her symptoms:

> The prednisone that [Plaintiff] took back in May was helpful[,] but in the past month since July she is having worsened joint pain especially in her hands [and] also [in her] hips . . . [and] knees, and pain and swelling in the feet especially the great toes. It is hard to walk in the morning and she has 3 hours of morning stiffness.  She cannot grip a cup of coffee.  She has difficulty bending forward because of hip pain. Symptoms are worse in the morning.  She also has a lot of fatigue. . . .  As far as [her] work capacity, she used to work as a surgical coordinator but cannot grip or use her hands and has difficulty doing anything in the morning due to pain and stiffness.

(AR 971.)

The ALJ found that "the limitations opined by Dr. Libman are not supported by the mild clinical findings and are entitled to little weight."  (AR 1081.)  But Dr. Libman's opinions

18

regarding Plaintiff's limitations are largely consistent with Dr. Delgado's opinions on this issue. (*See* AR 977–79.)

Similar to the ALJ's assessment of Dr. Delgado's opinions, the ALJ did not adequately explain his analysis of Dr. Libman's opinions within the treating physician framework. Dr. Libman's opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). While Plaintiff received treatment by Dr. Libman, she received positive anti-DNA and ANA tests, which are strong indicators of lupus. (AR 1035–36.) Dr. Libman also consistently assessed joint tenderness and swelling upon musculoskeletal examination. (AR 974, 1002, 1013, 1026.) Finally, Plaintiff testified that she was unable to hold a cup of coffee, she consistently wakes up with her hands swollen, and she must rest throughout the day because she is so fatigued and dizzy. (AR 71.) The ALJ minimized Dr. Libman's findings: "Dr. Libman noted severe joint pain, swelling and stiffness; but her clinical findings were mild to moderate tenderness over the wrists MCPs and PIPs, tenderness without swelling of the ankles and bilateral first MTPs, no synovitis of the knees, with mild tenderness over the medial joint lines, and unremarkable elbows and shoulders." (AR 1081 (internal citations omitted).) Unrecognized by the ALJ, however, are Dr. Libman's findings that Plaintiff's lupus was "flaring with severe arthritic symptoms." (AR 974.) Dr. Libman also found that Plaintiff "currently. . . would not be able to work," and thus Dr. Libman stated that she would "be filling out her disability paperwork [for Plaintiff]." (*Id.*) Although the statement that Plaintiff was unable to work may not be characterized as a medical opinion, it is relevant in assessing Dr. Libman's interpretation of Plaintiff's symptoms during the relevant time period. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Although "[a] statement by a medical source that [Plaintiff is]

'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [Plaintiff is] disabled," the Commissioner is expected to "review all of the medical findings and other evidence that support a medical source's statement that [Plaintiff is] disabled" when making her final decision. *Id.*

All the evidence in Dr. Libman's treatment notes and in the record as a whole supports Dr. Libman's opinions that Plaintiff would be restricted to lifting less than ten pounds less than occasionally and that her symptoms of severe joint pain and stiffness would likely cause her to be off task twenty percent or more of the day, in addition to her opinions regarding Plaintiff's limitations in sitting, standing, and walking. (AR 977–79.) Accordingly, the ALJ should have given more weight to Dr. Libman's opinions. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Moreover, the ALJ should have considered the *Burgess* factors in determining the weight to give Dr. Libman's opinions. *See Estrella*, 925 F.3d at 95–96. As discussed above, Dr. Libman's opinions are supported and consistent with the record. Additionally, Dr. Libman is a specialist in rheumatology, which is an important consideration in deciding how much weight to give her opinion. *See* 20 C.F.R. § 404.1527(c)(5). Finally, Dr. Libman treated Plaintiff for eighteen months; Plaintiff had four appointments with Dr. Libman regarding her symptoms before Dr. Libman rendered the relevant opinion. (*See* AR 963–92, 993–1018, 1019–33, 1045–50.) Dr. Libman relied on objective medical evidence, including Plaintiff's bloodwork, to support her opinion. The ALJ should have considered these factors in determining the weight to give Dr. Libman's opinion. The ALJ's failure to do so requires remand.

### C.    Dr. Lewis's Medical Opinions

Dr. Lewis, a state agency medical consultant, analyzed the record and assessed Plaintiff's exertional capacity on June 26, 2017. (AR 124–25.) Consequently, his opinion considered only

Dr. Delgado's records, and did not consider the records of Dr. Kromo, Dr. Libman, or any of

Plaintiff's other providers.  Dr. Lewis cites only Plaintiff's visits with Dr. Delgado in October

2016 and January 2017.  (AR 125.)  Dr. Lewis also cites a conversation Plaintiff had with a

representative from the Social Security Administration on February 14, 2017.  (*Id.* (citing AR

374).)

     Dr. Lewis agreed that Plaintiff's "statements about the intensity, persistence, and

functionally limiting effects of the symptoms" were "substantiated by the objective medical

evidence alone."  (AR 124.)  However, he assessed that Plaintiff could lift and/or carry twenty

pounds occasionally and ten pounds frequently.  (*Id.*)  He wrote that Plaintiff could stand, walk,

and sit for about six hours in an eight-hour workday.  (*Id.*)  Dr. Lewis explained that his

conclusion was based on Plaintiff's essentially preserved range of motion of her extremities, with

some limited tenderness and swelling.  (AR 125.)  Dr. Lewis noted that Plaintiff's RFC was

reduced due to her "lab suggestive immune disease," clinical polyarthritis, unspecified connective

tissue disease, and chronic pain.  (*Id.*)  Dr. Lewis concluded that Plaintiff would be "able to

perform work[-]related activities within the parameters of this physical RFC."  (*Id.*)

     The ALJ determined that "[a]lthough additional treatment notes were admitted to the

record after Dr. Lewis rendered his opinion, these additional treatment notes do not document any

meaningful change or deterioration in the claimant's presentation and these opinions remain

consistent with the evidence of record in its entirety."  (AR 1082.)  Accordingly, the ALJ

"afford[ed] Dr. Lewis'[s] assessment substantial weight."  (*Id.*)  However, as noted above,

Dr. Lewis's opinion excludes all the opinions and records of Dr. Libman and Dr. Kromo, who are

specialists and provide a longitudinal and in-depth assessment of Plaintiff's symptoms, limitations,

and prognosis.  Additionally, the records that Dr. Lewis considered constituted only a short period

of time in Plaintiff's entire medical history.  For example, Dr. Lewis noted that at Dr. Delgado's examination in October 2016, Plaintiff's gait was normal, and she had minimal tenderness in her feet and hands.  (AR 125.)  However, when Dr. Kromo examined Plaintiff in September 2016, she found that Plaintiff's gait was abnormal and antalgic, and that Plaintiff had pronounced tenderness upon squeezing the metacarpal and metatarsal joints, tenderness of her right knee, and stiffness of her spine.  (AR 877.)  Moreover, at Plaintiff's January 24, 2017 appointment, Dr. Delgado wrote that Plaintiff presented with fatigue, body aches, and mottled skin on her hands.  (AR 727, 731.)

Furthermore, when Plaintiff testified in 2019, she stated that after she drinks her coffee she has to wait "one or two hours until [she has] the strength to prepare something to eat."  (AR 72.) She also testified that when she goes to the grocery store with her son, she "will walk . . . from the car to the front of the store to the door and [she] wait[s] for a little bit and rest[s] and then [she] can go inside," but "sometimes [she] just turn[s] around and go[es] back to the car."  (AR 78.) Also noteworthy, Dr. Lewis's RFC determination considered Plaintiff's "good response to prednisone and hydrochloroquin[e]."  (AR 125.)  However, Plaintiff cannot remain on prednisone long-term due to risk to her bone density and risk of osteoporosis.  (AR 75.)

The ALJ also stated that Dr. Delgado and Dr. Libman's opinions do not receive controlling weight because "[t]he presence of the opinion of a DDS evaluating doctor provides the 'other substantial evidence' that obviates the grant of controlling weight."  (AR 1080.)  However, "[a] corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis." *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987).  Dr. Lewis considered two of Dr. Delgado's opinions from October 2016 and January 2017.  (AR 125.)  This accounts for only a four-month period throughout the course of the five-year period of Plaintiff's disability claim.

Dr. Lewis's opinion also does not consider Dr. Kromo's or Dr. Libman's opinions or treatment records.  Such a limited examination of Plaintiff's history and the record cannot constitute substantial evidence adequate to overcome Plaintiff's treating physicians' opinions.

"[T]he ALJ must 'give good reasons in [his or her] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.'"  *Estrella*, 925 F.3d at 96 (citing *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2))).  The ALJ has not given good reasons for assigning Dr. Delgado's opinions no weight, Dr. Libman's opinions little weight, and Dr. Lewis's opinion substantial weight.  (AR 1081–82.)  Accordingly, the case must be remanded for the ALJ to reweigh the opinions of Plaintiff's treating physicians, considering the record as a whole.

## II.    ALJ's Credibility Analysis

Plaintiff asserts that the ALJ erred in his analysis regarding her credibility with respect to how pain and other symptoms affect her RFC.[1]  (Doc. 10 at 7.)  The ALJ found that Plaintiff had medically determinable impairments that could reasonably cause Plaintiff's alleged symptoms.  (AR 1073.)  But the ALJ concluded that Plaintiff's statements regarding her "extremely limited range of functional abilities" were not fully supported by "the objective medical evidence of record."  (*Id.*)

It is the function of the Commissioner, not the Court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  *Carroll v. Sec'y of Health &*

---

[1]  Although still widely used by courts in this Circuit, the term "credibility" is no longer the Social Security Administration's preferred term for evaluating a claimant's subjective symptoms.  In a Policy Interpretation Ruling applicable on March 28, 2016 and republished on October 25, 2017, the Administration "eliminat[ed] the use of the term 'credibility' from [its] sub-regulatory policy," noting that the term is not used in the regulations and that the analysis called for in 20 C.F.R. §§ 404.1529 and 416.929 is "not an examination of an individual's character" but rather a "subjective symptom evaluation."  SSR 16-3p, 2017 WL 5180304, at *2 (S.S.A. Oct. 25, 2017).  Despite this change in terminology, "[t]he standard for evaluating subjective symptoms has not changed in the regulations."  *Debra N. v. Comm'r of Soc. Sec.*, 5:18-CV-215 (ATB), 2019 WL 1369358, at *7 n.9 (N.D.N.Y. Mar. 26, 2019).

*Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010).  The ALJ's credibility findings are entitled to "great deference" and may be reversed "only if they are patently unreasonable."  *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).  This standard of review takes into account that the ALJ, unlike the court, "had the opportunity to observe [the claimant's] demeanor while testifying."  *Marquez v. Colvin*, No. 12 Civ. 6819(PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013).

Although the ALJ "is not required to accept the claimant's subjective complaints without question," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010), the basis for the ALJ's rejection of those complaints must be stated "with sufficient specificity to permit intelligible plenary review of the record," *Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988).  So long as the ALJ has "identified specific record-based reasons" for his credibility finding, the court may not "second-guess" that finding.  *Stanton*, 370 F. App'x at 234; *see Lisa T. v. Comm'r of Soc. Sec.*, Case # 1:21-cv-469-DB, 2023 WL 203363, at *11 (W.D.N.Y. Jan. 17, 2023) ("[T]he ALJ exercises discretion in weighing the consistency of Plaintiff's allegations in light of the other evidence in the record."); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, we must defer to his findings."); *Aponte v. Sec'y Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." (citations omitted)).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  *Genier*, 606 F.3d at 49; *see* Social Security Ruling (SSR) 16-3p, 2017 WL

5180304 (S.S.A. Oct. 25, 2017).  First, the ALJ must determine whether the claimant possesses one or more medically determinable impairments that "could reasonably be expected to produce [the claimant's] alleged symptoms."  20 C.F.R. §§ 404.1529(b), 416.929(b).  If so, at the second step the ALJ must assess "the intensity and persistence of [the claimant's] symptoms, such as pain, and determin[e] the extent to which [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c), 416.929(c).  In considering the intensity, persistence, and limiting effects of the claimant's symptoms, the ALJ must "examine the entire case record, including the objective medical evidence; [the claimant's] statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the [claimant's] case record."  SSR 16-3p, 2017 WL 5180304, at *4.  The ALJ must also consider the following factors: (1) the claimant's daily activities; (2) the "location, duration, frequency, and intensity of pain or other symptoms"; (3) any precipitating or aggravating factors; (4) the "type, dosage, effectiveness, and side effects of any medication" taken by the claimant to alleviate his or her pain or other symptoms; (5) "[t]reatment, other than medication," that the claimant has received for relief of pain or other symptoms; (6) any other measures the claimant has used to relieve symptoms; and (7) "[a]ny other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms."  *Id.* at *7–8; *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ did not analyze the relevant regulatory factors.  Regarding Plaintiff's daily activities, the ALJ acknowledged Plaintiff's testimony that "on a typical day she was unable to clean or cook, but could make a cup of coffee and prepare[] something to eat."  (AR 1072.)  The ALJ further recognized that Plaintiff "testified that throughout a typical day she l[ay] down a lot, watched television, talked to her mother, helped her mother pay bills online, and cared for her

grandchildren." (*Id.*) But Plaintiff also testified that she needed to hold her coffee cup with both hands, and that she could not pick up the milk and could not open the container of milk or water. (AR 71.) Plaintiff further testified that generally, after she drinks her coffee, she must wait one to two hours to gather the strength to prepare something to eat. She described her limited daily activity: "I don't really do a lot . . . at home. I don't clean, I don't do anything. I l[ie] down, I get up[,] I l[ie] down again." (AR 72.) In a typical day, Plaintiff watches about one to two hours of television, speaks with her mother on the telephone, and goes online to do things like helping her mother pay her bills. (*Id.*) She speaks with her mother on speakerphone because she is unable to hold the phone. (*Id.*) She also testified that her son and daughter-in-law "would like for [her] to take care of [her grandchildren] every day but [she] can't," and thus the children's other grandmother watches them more often. (AR 76.) Plaintiff testified that she is unable to care for her grandchildren because she cannot pick up her one-year-old granddaughter because she is "scared because [her] hands don't have the strength to really pick her up" and she has trouble bending over because she has pain in her knees. (AR 77.) Additionally, between 1:00 p.m. and 3:00 p.m. Plaintiff has to lie down because she "feel[s] more tired, more fatigued." Lying down allows her to recover her energy. (*Id.*) When she was working, "at about that time of day, [she] had to leave because [she] wouldn't be able to function" because she "couldn't focus" and "[a]ll she wanted to do was just l[ie] down." (*Id.*) The ALJ did not consider these limitations in Plaintiff's daily activities in his credibility analysis. (*See* AR 1072.)

The ALJ also did not analyze the location, duration, frequency, and intensity of Plaintiff's pain or other symptoms. Plaintiff has pain in her knee, elbows, fingers, knuckles, wrist, and feet. (AR 1096.) Her feet are constantly in pain and are "getting big and red[,]" and "[a]t night they feel like a bubble." (*Id.*)

26

At the September 25, 2019 hearing, Plaintiff described the extent of her discomfort:

> My hands are always swollen.  They're like tingling, there, they have no feeling.  I cannot always get up from bed.  Between 1:00 and 3:00 I always have to l[ie] down because I feel light-headed like I'm going to faint.  I always feel tired, I always, I'm always in pain.  My knees, my hands, my feet, my entire body feels pain.  I very easily I get very tired I can't walk up the stairs I get too tired.  I get headaches.  Sometimes I am so tired I almost can't breathe properly.

(AR 71.)  Plaintiff further stated that when she wakes up in the morning, her hands are swollen for "[a]t least three hours but sometimes they are swollen the entire day."  (AR 73.)  She cannot bend her knees from the pain and swelling, and "sometimes the pain is so intense" that she "limp[s] around" because "it's hard for [her] to walk normally."  (*Id.*)  This pain persists for the entire day, almost every day, and causes her to stay in bed.  (AR 74.)  She further testified that she lost her job because she "never knew how [she] was going to be feeling and [she] would have to miss work maybe three times a week, four times in a week."  (*Id.*)  In terms of frequency and duration of her symptoms, Plaintiff has consistently reported these symptoms at her medical appointments during the period prior to her alleged disability onset date in February 2016 (AR 767–69) and through her date last insured in December 2021 (*see* AR 1090–1108).  Plaintiff specifically reported that she is unable to work as a surgical coordinator because it is a very stressful job, and the stress makes the pain worse and makes her feel more fatigued.  (AR 1098–99.)  She further stated that she cannot work as a billing clerk because she "can't be on the computer the whole time [because of her] hands" and she "can't type for too long or write."  (AR 1099.)

The ALJ found that Plaintiff's symptoms improved with medication, and thus he determined that the evidence did not support her alleged limitations.  (AR 1079.)  The ALJ noted that throughout Plaintiff's treatment, she has been prescribed prednisone, Plaquenil, Medrol, and methotrexate, among other medications.  (AR 1074, 1077.)  But Plaintiff testified that although she felt better when taking prednisone, she was unable to take it continuously out of concerns for

her bone density and risk of osteoporosis.  (AR 75.)  Moreover, Dr. Libman wrote in a treatment

record that Plaintiff was "on Plaquenil with inadequate response," and that although Plaintiff

improved on prednisone, she could not stay on the medication long term "due to risk of side

effects."  (AR 977.)  Dr. Kromo also prescribed Plaintiff Medrol with some positive results (AR

850), but Dr. Kromo later suggested Plaintiff wean off Medrol because the benefits to Plaintiff

were unclear (AR 852).  Finally, while Plaintiff testified that methotrexate made her "feel[] a little

better" (AR 1097 (testifying that her pain level was a seven out of ten when on the medication,

compared to a ten out of ten when not on the medication)), she also testified that the medication

had an adverse effect on her liver, causing her to terminate its use (AR 1096; *see* AR 1536).

Consequently, any relief afforded to Plaintiff through medication has not been a long-term

solution for Plaintiff and thus cannot reasonably provide a basis for the ALJ's discounting the

veracity of Plaintiff's reported limitations.

For these reasons, substantial evidence does not support the ALJ's assessment of Plaintiff's

credibility, and the case should be remanded for the ALJ to conduct a complete analysis of

Plaintiff's credibility.

### III. Remand for Further Proceedings or for a Calculation of Benefits

When a court concludes that an ALJ's decision is not supported by substantial evidence or

does not apply the correct legal standards, the court may either remand for a new hearing or

remand for the limited purpose of calculating benefits.  *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 133,

136 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).  Remand for the

calculation of benefits is appropriate when the record provides persuasive proof of disability and

the application of the correct legal standards "could lead to only one conclusion."  *Johnson v.*

*Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *see Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)

(remand for calculation of benefits where the record supports a finding of disability and remand for further proceedings "would serve no purpose"). However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," the court should remand "for further development of the evidence." *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999).

Given that the ALJ did not apply the proper legal standard to the evidence in the record, it cannot be said in this case that remand for further proceedings would serve no purpose. On remand, the ALJ must reweigh the medical opinions in accordance with the treating physician rule, as explained above. The ALJ must also conduct a new credibility analysis, considering the regulatory factors discussed above. Plaintiff's claim is therefore remanded for further proceedings.

## Conclusion

For these reasons, the Court GRANTS, in part, Plaintiff's motion (Doc. 10), DENIES the Commissioner's motion (Doc. 12), and REMANDS the matter for further proceedings and a new decision consistent with this Opinion.

Dated at Burlington, in the District of Vermont, this 11th day of December 2023.

*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge